CLERK'S OFFICE
A TRUE COPY
Nov 09, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with three Facebook accounts of Cornelius M. Jackson more fully described in Attachment A, that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

)
)
)
)
)

Case No.    20    MJ    220

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:1591(a)(1) &(b)(1) | Sex trafficking by force, fraud, or coercion |
| 18:1594(b) | Conspiracy to engage in sex trafficking |
| 18:2421 | Interstate transportation for the purpose of prostitution |

The application is based on these facts:

See attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Special Agent Melissa Fus*

*Applicant's signature*

Special Agent Melissa Fus, DOJ-DCI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means).*

Date: November 9, 2020

City and state: Milwaukee, WI

*Judge's signature*

William E. Duffin, US Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Melissa A. Fus, being first duly sworn, hereby depose and state as follows:

## I.       INTRODUCTION AND AGENT BACKGROUND

1.       I am a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and have been in law enforcement since 2003.

2.       I am currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice and the Federal Bureau of Investigation Wisconsin Human Trafficking Task Force ("WHTTF").  My duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults.  I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3.       The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable.  Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

4.       This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II.      PURPOSE OF AFFIDAVIT

5.       I make this affidavit in support of applications for a search warrants for information associated with Facebook and Instagram accounts that are stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company

headquartered in Menlo Park, California. The records to be produced and searched are described in Attachment B.

6.    This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) & 2703(c)(1)(A). Specifically, the Court is "a district court of the United States... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.    More specifically, I seek authorization to search Facebook, Inc.'s information associated with the following individual, who I have identified by name as well as account names:

| NAME | FACEBOOK ACOUNT | SCREEN NAME |
|------|-----------------|-------------|
| Cornelius M. Jackson | https://www.facebook.com/Still.Shinnin.2018 | Corey Grills |
| Cornelius M. Jackson | https://www.facebook.com/corey.f.jackson | Corey Grills |
| Cornelius M. Jackson | https://www.instagram.com/stillshinnin | Still Shinnin |

8.    Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that Cornelius M. Jackson has committed violations of Title 18, United States Code, Section 1591(a)(1) and (b)(1) (sex trafficking by force, fraud, or coercion); Title 18, United States Code, Section 1594(b) (conspiracy to commit sex trafficking); and Title 18, United States Code, Section 2421 (interstate transportation for the purpose of prostitution). There is also probable cause to search the information described in Attachment A for evidence of these crimes, further described in Attachment B.

2

### III.    PROBABLE CAUSE

####    A.  Trafficking of AV-1

#####       i.    Initial Investigation

9.      On the evening of June 30, 2020, the Oneida Police Department responded to a report of an adult female, hereinafter referred to as AV-1, who had been held against her will at the Radisson Hotel in Ashwaubenon, Wisconsin.  AV-1's younger sister had called 911 from outside the hotel before she and AV-1 were engaged in a brief car chase by subject Cornelius M. Jackson.  Officers met AV-1 and her sister in the parking lot of the Hobart Village Hall, where they had pulled over after the chase ended.

10.      AV-1's sister reported that on June 28, 2020, AV-1 called her from a number she was not previously familiar with, 262-212-XXXX.  AV-1 said she was safe but that she needed a ride home.  AV-1's sister asked for the address, but AV-1 never sent it, and she had no further contact with AV-1 that day.

11.      On June 30, 2020, at approximately 10:00 a.m., AV-1's sister received a SnapChat message from AV-1.  AV-1 again asked for a ride.  This time, she said she did not feel safe anymore.  Later that day, AV-1 sent her sister the address of the Radisson Hotel, which is 2040 Airport Drive, Ashwaubenon, Wisconsin.  AV-1 specified she was in room number 3387.  AV-1 told her sister that it was not safe for her to come to the room and to wait in the parking lot of the adjacent Oneida Casino.

12.      AV-1's sister arrived at the Casino parking lot at approximately 5:30 p.m. that day.  She took a photo of where she had parked and sent it to AV-1 via SnapChat.  AV-1 instructed her sister to wait in her car and told her she would try to leave as soon as she could.   After

3

approximately 15 minutes of waiting, AV-1's sister called their mother, who told her to call the police.

13.     While she was on the phone with 911, AV-1's sister saw AV-1 running from the building toward her vehicle. AV-1 got into the vehicle and immediately told her sister to start driving. AV-1's sister began driving while still updating the 911 dispatcher about what was going on.

14.     While they were still in the Casino parking lot, AV-1 started yelling, "That's their car!" AV-1's sister observed a red Cadillac truck driving head-on towards her vehicle. Because the red Cadillac was blocking her route, she put her car into reverse and, in her haste, struck a light post.

15.     AV-1's sister was able to leave the parking lot, but the red Cadillac followed her. AV-1 narrated to the 911 operator how the Cadillac was pursuing her and attempting to run her vehicle off the roadway. Eventually, the red Cadillac turned around, and AV-1's sister pulled into the parking lot of the Hobart Village Hall.

16.     AV-1 was also interviewed in the parking lot. She reported that Cornelius Jackson, whom she knew as "Corey," had taken against her will, sexually assaulted her, and forced her to have sex with men for money. Throughout the interview, AV-1 was visibly upset and emotional, her voice was shaky, and she was crying. AV-1 identified the man who did this to her as "Corey." AV-1 said she told the male subject "Corey" that she wanted to get out of the vehicle, but he would not let her, and he told her that she could not leave.

17.     AV-1 described how Jackson would not allow her to leave the hotel room without someone going with her. AV-1 said she secretly contacted her sister on a cell phone that Jackson had given her. AV-1's opportunity to escape came when she disclosed to a commercial sex

4

customer that she was being held against her will, and he told her to run. She indicated that she was afraid for her safety.

18.     AV-1 said Jackson forced her to have sex with men for money against her will on three occasions, once in Waukesha and twice in Green Bay. She also disclosed that Jackson had sexually assaulted her.

19.     AV-1 said she knew Jackson, whom she called "Corey" throughout the interview, by his Facebook name of "Corey Grills." She was also aware that he had an Instagram account under the name "Stillshinnin." AV-1 identified Jackson as "Corey" from a photo taken from the Facebook account under the name "Corey Grills."

20.     AV-1 said there was another female with her and Jackson, hereinafter referred to as AV-3. AV-1 identified AV-3's Facebook page by name to the officers, and she was able to identify AV-3 from a photo from that account.

21.     Later that evening, an officer conducted a more thorough interview with AV-1 while at the hospital for a Sexual Assault Nurse Exam (SANE). AV-1 said that Jackson and AV-3 picked her up on the afternoon of June 27, 2020 to go to the lakefront in Milwaukee. Another male subject whom AV-1 knew as "Gotti" was with.

22.     The four of them stayed at the beach in Milwaukee until approximately 9:00 p.m. Afterwards, they went to a barbecue at a house in Milwaukee until approximately 3:00 a.m. on June 28, 2020. After the party AV-1, AV-3, Jackson, and "Gotti" went to Jackson's apartment on Big Bend Road in Waukesha, Wisconsin, and spent the night there. AV-1 recalled Jackson's apartment number had the letter "A" in it.

23.     On June 28, 2020, AV-1 told Jackson that she wanted to go home and would get a ride from someone. Jackson then told AV-1 that she was not leaving. Jackson told AV-1 that she

was going to Green Bay with him and AV-3 to "do business." AV-1 knew what "do business" meant because she knew that Jackson posted online ads for females advertising massages and sex with men for money in Green Bay. Although AV-1 knew about the "business," AV-1 did not know at this time that Jackson planned to have AV-1 engage in commercial sex acts.

24.    AV-1 told Jackson that she did not want to go to Green Bay. Jackson then told AV-1 to go upstairs in the apartment, and AV-1 told Jackson that she did not want to go upstairs.

25.    Jackson grabbed AV-1 by her hair and dragged her up the stairs. He forced her onto the bed, put his hand around her neck, and started choking her. AV-1 told Jackson that she could not breathe, and Jackson told AV-1 that she was coming to Green Bay.

26.    Jackson removed AV-1's clothing and started slapping her vagina. AV-1 told Jackson to stop and continued moving her legs in an attempt to prevent Jackson from further slapping her. Jackson told AV-1 to stop and yelled for AV-3. AV-3 then came into the room and Jackson instructed AV-3 to hold down AV-1's legs. AV-3 complied and then Jackson moved AV-1's hand to above her head and held them down.

27.    Jackson then instructed AV-3 to "put [AV-1] in her place." AV-3 started slapping AV-1 on her nude vagina. AV-1 said the incident lasted approximately 20 minutes and concluded with Jackson again telling AV-1 that she was not leaving.

28.    At approximately 5:00 p.m., AV-1 messaged a friend and indicated that she was in an unsafe situation. Jackson observed AV-1 texting on her phone. He took her phone from her and called her a "lying bitch."

29.    Jackson grabbed AV-1 by her arm and walked her upstairs to the bedroom. He told AV-1 to get on the floor, pulled down his pants, and told AV-1 to "suck his dick." Jackson then grabbed AV-1 by her hair and shoved her onto the bed. AV-1 told Jackson to stop, but

6

Jackson got on top of AV-1. He "shoved" his penis into her vagina and told AV-1 that she was going to enjoy it.

30.    AV-1 punched Jackson in the chest multiple times and told him to stop. Jackson then forced his penis into her vagina harder, causing her to bleed. Jackson told AV-1 that he wanted her to have his child. After Jackson ejaculated, she took a shower, cleaned the bedroom, and went back downstairs.

31.    AV-1 no longer had her cell phone, so she was unable to call anyone. She stayed at Jackson's apartment another night. Although Jackson and "Gotti" went out, Jackson left AV-3 behind to watch AV-1 and make sure AV-1 did not leave.

32.    On the morning of Monday, June 29, 2020, Jackson came into the room where AV-1 was sleeping and asked why she wanted to go home. AV-1 and Jackson talked, and AV-1 believed that Jackson was agreeing to take her home.

33.    A short time later, she and Jackson got into a dark-colored BMW, and AV-3 followed them in the red Cadillac truck. AV-1 noticed that Jackson passed the exit to her residence, and she again told Jackson that she wanted to go home. Jackson continued to tell AV-1 that he was taking her home while driving further past AV-1's exit. AV-1 realized that Jackson had no intention of taking her home, and she argued with him for the entire drive.

34.    That afternoon, they arrived in Ashwaubenon, and Jackson rented room 3387 at the Radisson Hotel for himself, AV-1, and AV-3. Once in the room, AV-1 took a shower. Jackson came into the bathroom and entered the shower with AV-1. AV-1 told Jackson that she did not want to shower with him, but he insisted.

35.    Jackson started touching AV-1's breasts and vagina. Jackson then told AV-1 to turn around and inserted his penis into her vagina without her consent. Next, Jackson grabbed

7

AV-1's arm and directed her out of the shower to the hotel room bed. Jackson got on top of AV-1 and again inserted his penis into her vagina without consent, causing her to bleed. AV-1 told Jackson multiple times to stop because he was hurting her. Jackson ejaculated inside of AV-1, and AV-1 said she returned to the shower to clean up from the blood. There was blood on AV-1's shorts and the bed sheets, and AV-1 discarded the shorts as a result.

36.     Later that day, Jackson told AV-1 that he posted ads online advertising her for prostitution. AV-1 was not sure where Jackson posted the ads, but she knew they advertised that she would give massages and have sex with people for an hour in exchange for money. Jackson then handed AV-1 a cell phone and told her she had a prostitution date with a customer who was going to meet her inside the Oneida Casino. Jackson told AV-1 that she was having sex with the male subject for $350.

37.     That night, AV-1 was approached by a male subject later identified as Brandon Kline in the bar area of the casino. Kline asked if she was "Anna" and AV-1 confirmed. AV-1 and Kline walked to room 3387, where they engaged in sexual intercourse for approximately 30 minutes. Kline paid AV-1 $350. When Kline left the hotel room, AV-1 notified Jackson.

38.     Jackson returned to the hotel room to retrieve the money from AV-1. He accused AV-1 of pocketing additional money that he believed Kline had given her in addition to the $350. Jackson placed one hand around AV-1's neck and started choking her. AV-1 told him to stop. Jackson stopped choking AV-1 and started to search and "trash" the room looking for additional money.

39.     AV-1 left the hotel room and went to the casino with the cell phone that Jackson had previously given her. She messaged a friend and asked for a ride. The friend could not pick

8

her up, so she messaged her sister. AV-1's sister said she could pick AV-1 up but needed the address.

40. At that moment, AV-3 approached AV-1 in the casino, and AV-1 returned with AV-3 hotel room, where Jackson was waiting. AV-1 felt that she was unable to provide the address to her sister without raising Jackson's suspicions.

41. The following day, AV-1 pretended to sleep until noon. Meanwhile, AV-1 still had the phone that Jackson gave her, and she messaged her sister on SnapChat with the address of the hotel.

42. Around 4:00 p.m., Jackson told AV-1 that a male subject was going to meet her by the elevator, and that he wanted the same thing as Kline had wanted the previous evening. Jackson told AV-1 that if she did not do the date, she would not be going home.

43. AV-1 met the male subject by the elevator and engaged in intercourse with him in room 3387. After this male paid AV-1 and left, AV-1 called Jackson, and Jackson and AV-3 returned to the room. After collecting the money, Jackson told AV-3 and AV-1 that he was going to pick up tacos. Jackson also told AV-1 another male subject was on his way and that AV-1 needed to meet him by the elevator.

44. AV-1 said she walked to the elevator and saw Kline waiting for her. AV-3 stood in the hallway watching as AV-1 met Kline. When they got sufficiently far from AV-3 , AV-1 told Kline she was being held against her will. Kline told her to run when they reached the end of the hallway.

45. AV-1 ran down the stairs and out into the parking lot. AV-1 knew that her sister was already in the parking lot because they had been messaging each other on SnapChat. AV-1 jumped into her sister's car and started to cry.

9

46.     Oneida PD followed up with the Radisson Hotel and received records showing that room 3387 was rented by Jackson beginning on June 29. A hotel employee also advised that Jackson had checked out of the room at approximately 6:30 p.m. on June 30, despite having rented the room for four nights. Hotel staff also advised that there was a vehicle associated with Jackson's stay, and it had a Wisconsin license plate of ADC7343.

47.     Officers compared Jackson's driver's license photo to the photo of "Corey" that AV-1 had identified from Facebook to confirm his identity. A WI DOT check on license plate ADC7343 showed that the vehicle was a 2019 Cadillac Escalade registered to AV-3.

48.     Hotel staff gave officers a key to room 3387 and allowed them to search it. Officers secured, searched, and photographed the unoccupied hotel room. Various used towels, clothing, a Forever 21 price tag, bedding, and a used condom and wrapper were collected. The clothing collected included a pair of bloody jean shorts found in the garbage.

49.     Officers also reviewed surveillance from the Radisson Hotel and the Oneida Casino. In the footage from the night of June 29, 2020, AV-1 could be seen meeting Kline in the casino, then walking to the entryway, the hotel, and then to the stairs. Approximately one hour later, AV-1 could be seen walking Kline to the exit of the casino. Shortly thereafter Jackson is seen approaching AV-1 and walking up the stairs with her.

### ii.     Follow-Up Interview of AV-1

50.     On September 8, 2020, I conducted a follow-up interview with AV-1. AV-1 recounted many of the same details given above, and she also provided additional information.

51.     AV-1 said she met first Jackson in March 2020, through Jackson's girlfriend at the time, named Marlee. AV-1 and Marlee met on a dating app called Tindr. Marlee's profile name on Tindr was "Kim," and her profile photo was a picture of her face. Marlee told AV-1 that she

was in a relationship with Jackson and that they were both interested in meeting her. AV-1 agreed to meet them in person approximately one week later.

52. Marlee and Jackson picked AV-1 up from her residence in mid-March 2020, and they had lunch together. Afterwards, they went back to Marlee and Jackson's apartment in Waukesha. Jackson left to go to work, and AV-1 hung out with Marlee and her young son.

53. Approximately six to eight hours later, Jackson returned home. Marlee made dinner, and they all hung out. AV-1 spent the night at the apartment.

54. AV-1 went home the following morning, however Marlee picked her up again that afternoon and brought her back to the apartment in Waukesha. AV-1 then stayed at the apartment in Waukesha for the following four to five nights.

55. While AV-1 stayed at the apartment, she learned that Marlee was conducting commercial sex dates. Early on, Marlee told AV-1 that there would be guys coming in and out of the apartment. AV-1 in fact witnessed six to seven males come to the apartment at various points to engage in sexual activity with Marlee in exchange for money. The males would go into a room designated for this purpose with Marlee, and AV-1 would hang out somewhere else in the apartment and wait.

56. AV-1 observed Marlee give money to Jackson after some of the prostitution dates. Marlee also told AV-1 that she had to give all the money to Jackson and that she could not "pocket" any of the money. Marlee also told AV-1 that Jackson used the money to buy stuff for "them." Marlee had a goal of earning $10,000 to $20,000 per month.

57. Marlee asked AV-1 multiple times if she wanted to do prostitution dates, and she indicated the money was good. Jackson also tried to persuade AV-1 to do prostitution dates.

11

Jackson told AV-1 that she would not have to have a regular job, she would not have to worry about finances, and she would be taken care of. Each time, AV-1 declined.

58.     After AV-1 had been staying at the apartment for approximately three days, AV-1 went with Marlee to pick up another female whom AV-1 knew as "Charlie." AV-1 did not observe "Charlie" engage in sexual activity for money or give Jackson any money, but Jackson and "Charlie" argued about her doing prostitution dates. AV-1 also heard Jackson and Marlee arguing about the dates she was doing.

59.     AV-1 became increasingly uncomfortable with the arguing between "Charlie," Jackson, and Marlee, the dates Marlee was conducting at the house, and Jackson's attempts to persuade her to start doing dates, so she decided to leave. On the day she went home, Marlee messaged her and said that "Charlie" had also left. Marlee and Jackson continued to message AV-1 and told her that she should come back, but AV-1 declined.

60.     After AV-1 left, Jackson would occasionally reach out to her via Instagram and via text, but AV-1 blocked him and ignored his messages.

61.     In June 2020, Jackson messaged her on Facebook. AV-1 initially ignored him, but after looking at his Facebook posts, she learned that his daughter had died. AV-1 felt bad for Jackson, so she replied to his messages on Facebook.

62.     Jackson told AV-1 that he and Marlee had broken up and that AV-1 should meet his new girlfriend, AV-3. AV-1 said she eventually went to the beach on June 27, 2020, which was followed by the above-described additional nights at Jackson's Waukesha apartment, and Jackson forcing AV-1 to travel with him to Ashwaubenon to engage in commercial sex acts.

63.     AV-1 said Jackson was the one who posted her commercial sex ads and communicated with her potential dates. Jackson would then tell AV-1 when a date was coming

and how much money to collect from the date. AV-1 believed Jackson was using TextNow or TextFree to communicate with the dates. The dates who came called her "Anna." AV-1 believed she conducted four dates total, two of which were with Kline.

64. AV-1 reiterated that on June 30, 2020, she reached out to her sister on SnapChat to ask for a ride. She used a "community" phone that AV-3 and Jackson were using for setting up dates. The phone did not have cellular service and only operated on Wi-Fi. AV-1 said she would go into the bathroom to message her sister.

65. AV-1 communicated with Jackson via his Facebook and Instagram pages in March and June of 2020. AV-1 said she knew Jackson had a SnapChat account, but she was not sure what his name was for the account. She recalled that when Jackson took her cell phone, he added his SnapChat account as a friend to her account.

### iii. Interview with Brandon Kline

66. On Monday September 21, 2020, DCI SA Justen Ragen conducted an interview with Brandon Kline, the commercial sex customer who had gone to the Radisson Hotel twice for dates with AV-1.

67. Kline indicated that he located an ad for AV-1 on the Skipthgames.com. He exchanged text messages with the number in the ad and he eventually talked on the phone with a female. Kline was instructed to go to the Oneida Casino near the Green Bay Airport. Kline stated he was told he had to pay $350 to have sex and the time limit was an hour.

68. Kline indicated that AV-1 did not have any rules, and Kline did not use a condom when he had sex with AV-1. Kline said he left $350 on the nightstand in the hotel room.

69. After leaving the hotel, Kline sent messages to AV-1 about having a good night and then he arrangements to see AV-1 the following day. Kline arrived to the hotel and met with AV-

1 in the hallway near the stairs he used to leave the prior evening. It was at that point that AV-1 told Kline that someone was after her and she needed to leave. AV-1 told Kline that her sister was coming to pick her up.

70.     Kline advised that once he and AV-1 neared the exit doors, AV-1 saw her exit strategy and she took off running out the exit doors. Kline did not see where AV-1 ran to, and he left the property.

**B.  Jackson's Facebook, SnapChat, and Instagram Accounts Identified**

71.     I searched for "Corey Grills on Facebook and noted that there were two separate accounts with that name. The URLs for the pages were www.facebook.com/Still.Shinnin.2018 and www.facebook.com/corey.f.jackson. I reviewed the publicly available content for both accounts and saw that both had photos of Jackson posing with a younger female (believed to be Jackson's deceased daughter).

72.     The page associated with URL www.facebook.com/Still.Shinnin.2018, displayed a linked Instagram account of www.instagram.com/stillshinnin. I reviewed the publicly viewable material for that Instagram account and saw that there were photos of Jackson as well as several other unknown males and females modeling gold teeth or "grills." This Instagram account listed Jackson's SnapChat account as StillShinnin89 and his phone number of 414-949-XX40.

73.     On September 9, 2020, I submitted preservation requests to Facebook, Inc. for the Facebook and Instagram accounts and to SnapChat for that account.

**C.  Trafficking of AV-2**

74.     On August 23, 2020, at approximately 4:59 a.m., officers of the Milwaukee Police Department (MPD) responded to 1400 East Brady Street in Milwaukee to investigate a report of

14

battery and abduction. At the scene, MPD had contact with an adult victim hereinafter referred to as AV-2.

75.     AV-2 told MPD that approximately two and a half weeks earlier, she had met a man whom she knew as "Cornelius," "Corey," and "Grills" (later confirmed to be Jackson) on an online dating app called BLK. Based on their online conversations, she had agreed to meet him in person.

76.     Jackson picked AV-2 up from her home in Appleton, Wisconsin, and she began staying with Jackson and two other women at an apartment in Waukesha, Wisconsin. AV-2 told MPD that she moved in with Jackson in order to pursue a "poly" relationship with Jackson and a woman hereinafter referred to as AV-3. Early on, AV-2 had a consensual sexual relationship with Jackson and AV-3.

77.     AV-2 said she had come to Brady Street with Jackson AV-3, and another woman living with them, hereinafter referred to as AV-4, to celebrate AV-3's birthday. Jackson instructed AV-2 to "chat up" men on the street and to try to get them to agree to a "date."

78.     AV-2 initially denied that she was involved in sex trafficking or that Jackson or anyone else was trying to get her to date men for money. AV-2 described how Jackson had become violent with her as the group attempted to depart the area in a red, newer-model Cadillac Escalade that she said Jackson frequently drove. AV-2 said Jackson had placed his hands around her neck and choked her until she lost consciousness and collapsed to the ground outside the vehicle.

79.     MPD asked AV-2 if she was involved in something she did not want to be, and AV-2 said, "Yes." AV-2 told MPD she wanted to get out but did not want the others to know because they might harm her. With AV-2's consent, MPD pretended to arrest AV-2 and placed her in the back of an MPD car in order to speak privately with her about her situation.

15

80.     MPD continued to interview AV-2 in the back the vehicle, and AV-2 made additional disclosures about her interactions with Jackson earlier in the evening and at the shared residence in Waukesha.  She explained that Jackson had told her two days prior that she needed to start earning "what she was worth" and added that he would kill her if she did not do what he wanted because she was now his "property."  AV-2 stated that she had agreed to move in with Jackson and AV-3 in order to pursue a "loving 'poly' relationship," not to perform "sex dates for money."

81.     AV-2 explained that on two prior occasions, Jackson had gotten angry with her and choked her when she failed to do what he said or "follow his rules."

82.     At this point, an MPD Sensitive Crimes officer joined the interview.  AV-2 explained that after Jackson picked her up in Appleton, he drove her to the Oneida Hotel & Casino near Green Bay, Wisconsin.  There, they were joined by three other women, including AV-3 and AV-4.  It soon became apparent to her that the other women were performing prostitution dates out of a second-floor hotel room that they all shared.  She realized that prostitution dates were occurring in the room because she would be asked to briefly leave the room when men arrived and because she observed condoms on the nightstand in the room.  AV-2 also observed the women give Corey money after the men had left the room.

83.     After three days, she and the rest of the group left the Oneida Hotel & Casino and went to Jackson's apartment, located at XXXX Big Bend Road, Unit #A, in Waukesha, Wisconsin.  AV-2 explained that one of the bedrooms in the Waukesha apartment was set up as a "massage room," which was used to host prostitution dates.  Jackson would leave the apartment or move to another room whenever a customer arrived for a commercial sex date.

84.     Jackson began asking AV-2 about "making moves," "making money," and "putting money in the team's pocket." Jackson told AV-2 that she needed to make money in order to pay the bills. AV-2 explained that she reluctantly agreed to perform prostitution dates for Corey after he "guilt-tripped" her into it.

85.     Acting on behalf of Jackson, AV-3 told AV-2 to "fake it until (you) make it." AV-3 also sent AV-2 a screenshot image showing what AV-2 should charge for various commercial sex acts with customers, including $150 for a quick visit, $200 for a half hour, $300 for an hour, $1,200 for an overnight visit, $300 for a half hour "two girl special," $500 for an hour "two girl special," $150 extra for "bareback" (meaning sex without a condom), $200 extra for fetishes, $200 extra for anal sex, $100 for a half hour massage, and $150 for an hour massage.

86.     Jackson and AV-3 also gave AV-2 rules to follow, including what to call Jackson ("Daddy"); how to conduct a date (including to count the money first, to text Jackson to let him know if everything is good, and to set a timer once that text was sent); how to validate a customer (including to request a picture of the person's penis and a middle finger and to ask if they are affiliated with law enforcement), and what to do if there was a problem (to text Jackson if anything was wrong or bad and, if so, that Jackson would show up with a gun). Jackson and AV-3 also provided AV-2 and the other girls with Trojan condoms and massage oil.

87.     AV-2 described Jackson's gun as an assault rifle that resembled a black and brown (wood) colored AK-47 with a curved magazine. Jackson never responded with the weapon to one of AV-2's prostitution dates, but she had heard that he had done so for some of the other women's bad commercial sex dates.

88.     Jackson took AV-2's cellular telephone and used photographs of AV-2 stored in her phone to create online commercial sex ads for AV-2 under the name "Precious." Jackson controlled the ads and conducted all of the communications with AV-2's prospective customers.

89.     Jackson told AV-2 and the other women that the "team" needed to generate a total of $10,000 per week by performing commercial sex dates. AV-2 performed a total of six commercial sex dates at Jackson's apartment in Waukesha, including three half-hour sex dates, two 15 minute quick visit dates, and one hour-long date with an extra fee for "bareback," or unprotected sex. The payments AV-2 received were consistent with the prices that were set in the screenshot from AV-3. Jackson and AV-3 collected all of the proceeds from AV-2's commercial sex acts.

90.     AV-2 advised that Jackson had brought AV-2 and the other women to Milwaukee on three occasions for them to solicit commercial sex dates with men at bars and clubs in the city's entertainment district, located in the vicinity of North Water Street and East Brady Street. On each occasion, she was unsuccessful in her attempts to arrange dates with men in these locations.

91.     On the evening of August 22, 2020, the group returned to Milwaukee and patronized an outdoor bar on Brady Street in order to celebrate AV-3's birthday. Jackson became angry with AV-2 when he learned that AV-2 had been speaking with one of Jackson's cousins, who met up with Jackson's group. AV-2 thought she had Jackson's permission to speak with his cousin, but Jackson later told her, "It doesn't matter if I gave you permission; you don't talk to another man."

92.     While she was standing on the sidewalk near the red Cadillac Escalade, Jackson slammed her head against the vehicle and began choking her by putting his hands around her neck.

18

AV-2 lost consciousness and fell to the ground.  AV-2 explained that when she regained consciousness, AV-3 told AV-2 to get into the vehicle.

93.     AV-2 explained that she remained in the vehicle for a short period while Jackson continued to level accusations against her. Jackson eventually told AV-2 to get out of the vehicle because they were leaving without her.  While still in the car, AV-2 found a cell phone and hid it on her person.  Once out of the car, AV-2 moved to a dark area and dialed 911 as the vehicle seemed to depart the area.  While she was speaking to the operator, Jackson returned and took the phone from her.  When a police vehicle drove past, however, Jackson left the area as AV-2 was approached by the responding MPD officers.

94.     MPD took pictures of AV-2, including the clothing she was wearing and an area of redness on her neck.  AV-2 also identified Jackson from a photo array.

95.     MPD located video surveillance footage of the area around 1400 East Brady Street, where Jackson had choked AV-2 against the Escalade.  An MPD surveillance camera facing eastbound from a location at North Warren Avenue and East Brady Street captured vivid footage of the strangulation, and the details observed matched AV-2's account.  A north-facing camera at the same location provided similarly vivid footage of Jackson approaching from behind AV-2 and taking the phone from her as she made her 911 call.  Jackson could be seen handing the phone to an older black male, then violently pushing AV-2 to the ground.

**D.  Search of Jackson's Apartment**

96.     On Tuesday, August 25, 2020, Waukesha County Circuit Court Judge Brad D. Schimel authorized a search warrant for Jackson's residence, located at XXXX Big Bend Road, Unit A, in Waukesha, Wisconsin.  The warrant authorized a search of the residence, as well as any vehicles associated with the premises and any electronic devices found during the search.

97.     The warrant was executed on August 27, 2020.  The investigators also searched the Cadillac Escalade, which was located at the residence at the time of the search warrant. Jackson, who was located in the residence at the time of the search warrant, was placed under arrest and taken into custody for state charges related to human trafficking, and strangulation.

98.     During the search of Jackson's residence, investigators located and seized various items of digital and physical evidence, including: 15 cellular telephones, two laptop computers, one tablet, 93 rounds of 7.62x39mm ammunition, and numerous other items of evidentiary value. The investigators also seized various personal items belonging to various women, including purses, credit cards, a social security card, a Medicaid card, a state driver's license, and a state identification card.

99.     The investigators photographed numerous items of interest, including a box of Trojan ENZ condoms and a "Best Massage" massage table.  These items were located in an otherwise empty room that had candles along the wall and a bottle of "Dr. Teal's Moisturizing Bath and Body Oil" on the floor.

**E.  Online Commercial Sex Ads**

100.    I searched various websites commonly used for commercial sex ads in the Eastern District of Wisconsin and found ads for AV-2.  My review of the ads turned up several associated phone numbers, including 262-355-XXXX; 262-297-XXXX; 262-667-XXXX; 414-295-XXXX; 708-762-XXXX, and 414-949-XX40.  I noted that the last number was the same number that Jackson had associated with his Instagram account.

101.    The most recent ad I found was posted in August 2020, and the oldest ad I located was posted in December 2014.  The ads were posted on Backpage.com, Eroticmugshots.com, and Skipthegames.com for the areas of Milwaukee, Waukesha, Green Bay, Madison, and Wisconsin

20

Dells. The ads contained nude and semi-nude photos of various women. Some of the names on the ads were "Kim," "Pocahontas," "Whisper," "Angel," and "Annabelle."

102. On September 10, 2020, I emailed a request for information to Skipthegames.com regarding the ads posted with the phone numbers of: 262-355-XXXX; 262-297-XXXX; 262-667-XXXX; 414-295-XXXX; and 708-762-XXXX. I received a response listing three email accounts responsible for posting the ads: StillShinnin.llc18@gmail.com, exoticwetdresms1@gmail.com, and StillShinnin@gmail.com.

103. One of the Skipthegames.com ads posted in Green Bay at 9:25 p.m., on August 2, 2020, includes photographs of AV-3 and AV-4. Using the title "Upscale two girls," the ad describes the "service providers" as massage therapists who "specialize in deep tissue and other services." In addition to sensual and therapeutic massages, the ad lists numerous other activities that the service providers "may enjoy," including: girlfriend experience, intercourse (anal), intercourse (oral), oral without condom, service by two providers, and various other sex acts. Based on my training and experience, I understand that the "girlfriend experience" refers to a commercial sex date in which the customer is allowed to pretend that he or she is in a romantic relationship with the date and to engage in behavior not typically involved in or permitted during a commercial sex date, such as kissing.

104. Another Skipthegames.com ad that was posted in Green Bay at 7:46 p.m. on August 3, 2020, appears almost identical to the ad posted on August 2, 2020. The only notable difference is that the photographs of AV-4 were replaced with photographs of AV-2. The photographs of AV-2 were the photographs that AV-2 indicated Jackson took from her cellular telephone without her permission.

F. **Review of Electronic Devices**

21

105.    Jackson's Apple iPhone was one of the electronic devices recovered by Waukesha Police Department during the August 27, 2020 search of Jackson's apartment. The device, which was found on the bed in the master bedroom, was identified by AV-2 as the cellular telephone that Jackson regularly used. FBI reviewed a forensic image of the device and identified numerous items of evidence corroborating statements made by AV-1 and AV-2.

106.    Jackson's phone had various social networking applications installed on it, including: "BLK-Dating for Black Singles." The BLK application was installed on Jackson's cellular telephone on July 12, 2020, which was approximately three weeks before Jackson allegedly met AV-2 on the website.

107.    Jackson's phone also had a communications application called "TextNow: Call + Text Unlimited" installed. The TextNow account active on that phone, which was linked to email account 'stillshinnin.llc18@gmail.com,' was being used to communicate as the TextNow telephone number (708) 762-XXXX. This number was found in many of previously-discussed Skipthegames.com commercial sex ads.

108.    There was also evidence that Jackson's phone was used to access Jackson's Facebook accounts, including 'corey.f.jackson' and 'Still.Shinnin.2018;' his Instagram account, 'stillshinnin;' and his Snapchat account, 'stillshinnin89.'

109.    Jackson's phone was linked to numerous email addresses, including:

 a. 'corey4boy@gmail.com',
 b. 'stillshinnin.llc18@gmail.com' (associated with a Skipthegames.com account),
 c. 'stillshinnin1989@gmail.com',
 d. 'exoticwetdresms1@gmail.com' (associated with a Skipthegames.com account,
 e. '4coreygrills@gmail.com',
 f. 'stillshnnin@gmail.com' (associated with a Skipthegames.com account),
 g. 'corey4grills@gmail.com', and
 h. 'stillcorey89@icloud.com'.

22

110.     Jackson's phone was also used to post commercial sex ads on Skipthegames.com. The phone's logs demonstrate that it was used to create, proofread, and/or post ads to Skipthegames.com throughout June, July, and August 2020, including on June 29 and 30, July 17 and 20, and August 2, 3, 6, 8, 10, 12 and 20, all dates on which ads for AV-1, AV-2, AV-3, and AV-4 have been identified.

111.     Jackson's phone contained photos of AV-1 and AV-2.  These included numerous intimate images of AV-1 and AV-2 that Jackson had taken from AV-1 and AV-2's phones.  Many of these images of AV-1 and AV-2 were subsequently included in ads on Skipthegames.com.

112.     Jackson's phone contained iMessage (iPhone-to-iPhone) communications between Jackson and AV-3 in which they discuss recruiting AV-2 to join "the team."  On August 2, 2020, at approximately 6:17 p.m., Jackson messaged AV-3 saying, "Go look for this bitch she trying to join the team."  This message was followed by a screenshot of AV-2's Instagram page.  When AV-3 asked if AV-2 was "here," Jackson responded, "I think she's in Appleton or Manitowoc."  Jackson also told AV-3, "I think we can get this bitch," to which AV-3 responded, "We getting the bitch."

113.     Jackson's phone also contained relevant communications with various women who were performing commercial sex dates on his behalf, including AV-1 and AV-2.   For example, on June 30, 2020, Jackson exchanged text messages with an individual using TextNow number (708) 762-XXXX.  Based on my conversations with AV-1, I believe that AV-1 was the user of the (708) number at that time, and their text conversation concerned a commercial sex date that AV-1 performed at the Radisson Hotel in Ashwaubenon.  Jackson inquired, "[I]s it good[?]"  AV-1 responded, "[I]t's all ok got the $."  A short time later, AV-1 stated, "[W]e used a condom."  Jackson replied, "He wanted bb."  AV-1 concluded the exchange by stating, "[H]e didn't have

enough $."  Based on my training and experience, I know 'BB' to refer to "bareback," or unprotected sex.

114.    On two occasions, once on August 10, 2020 and again on August 13, 2020, AV-2 communicated with Jackson via iMessage in order to say she was "good," as she indicated Jackson required her to do when a date had arrived and the money was received and counted.

115.    On August 15, 2020, Jackson sent AV-2 iMessages telling her to recruit a woman whom AV-2 had gone to school with.  After forwarding AV-2 a screenshot of the woman's Instagram page, Jackson told AV-2 how to recruit the woman by saying, "Ok Go hard," "You can get it let me see you work your magic," and "Bring her to this money team."  As Jackson monitored AV-2's interactions with the woman, he told her, "Don't tell her too much she had to come and kick it to understand the risk."

116.    Jackson's cellular telephone contained communications with prospective commercial sex customers wherein the terms of the proposed commercial sex acts were negotiated and the customers were vetted.  For example, on July 13, 2020, the TextNow application on Jackson's phone was used to arrange a commercial sex date with "Mike," who was using cellular telephone number (414) 399-XXXX.  Over the course of several hours, the person using Jackson's phone and "Mike" came to terms on the location of the visit (Jackson's Waukesha apartment), the length of visit (30 minutes), the type of visit ("bb," i.e., bareback, or without a condom), the price ($150 plus $160 extra for "bb"), and where to park (next to the Cadillac Escalade).  In order to proceed with the prostitution date, Mike was told to send a picture of his penis with his middle finger next to it.  Due to various issues, Mike ultimately sent a total of four pictures of his penis and one of his face.  Mike also sent three screenshots of his text message string in order to prove that he had in fact sent the required pictures.

117.     In separate correspondence with a different prospective customer on August 3, 2020, the TextNow application on Jackson's phone was again used to negotiate a commercial sex date with a customer using cellular telephone number (920) 489-XXXX.  The customer was told that there were two women available for him to see.  When the customer asked to see pictures of the other girl, Jackson's phone sent two intimate photographs of AV-2.  The customer asked about the age of the female (AV-2), and Jackson's phone replied, "20."  The customer responded, "Ok I'll see her."  This customer was also instructed to forward a photograph of his penis with his middle finger next to it.

118.     Jackson's phone also contained communications from Jackson's various social media accounts, including Facebook and Instagram, wherein Jackson appears to be recruiting women to join his "team."  For instance, on July 9, 2020, someone using Jackson's Instagram account ('stillshinnin') sent a message to an Instagram account ('emily') stating, "I love you to be with Me and my team."  On July 10, 2020, Jackson's Instagram account ('stillshinnin') sent a message to another Instagram account ('937125429') asking, "So you gonna let us put you on our team[?]"  And on August 21, 2020, Jackson's Facebook Messenger account ('corey.f.jackson') sent a message to Facebook accountholder "Sierra Honesty," who said she was attempting to move from Wisconsin to Arizona.  Jackson's account wrote, "Why move, be a part of my team," adding, "Bad bitches getting money team."  When Sierra Honesty said she was in Green Bay, Jackson told her, "I go to Green Bay every other weekend and collect a check LOL," "Come be a part of my team so I can help take some of the stress off your shoulders," and, "Go to my Snapchat; StillShinnin89 I'll show you the team."

### G.  Current Use of Jackson's Facebook Accounts

119.     Since his arrest on August 27, 2020, Jackson has continued to access his Facebook accounts, even while in the custody of the Milwaukee County House of Correction.  Based on recent witness interviews as well as ongoing review of Jackson's jail calls, I know that Jackson uses several friends and family members to communicate on his behalf via one of his Facebook accounts and his Instagram account.  Jackson has also used his network of associates to monitor and communicate via his Snapchat account.  On various occasions, Jackson has both dictated messages to be subsequently posted to his Snapchat account by his associates and he has also recorded audio messages to be later uploaded to his Snapchat account by his associates.

120.     While some of Jackson's recent Facebook communications have involved his jewelry business, most of the social media communications have involved contacting or re-contacting women for Jackson to later speak with on jail calls or on HomeWAV.  On one occasion, Jackson had an associate review historical Facebook messages that Jackson had exchanged with several women whom he met immediately prior to his arrest in late August.  On other occasions, Jackson has had his associates re-contact women who had prior relationships with Jackson.  Based on witness interviews, I know that several of these women historically performed prostitution dates on Jackson's behalf.  After resuming communications with one such woman, Jackson and the woman had a cryptic jail call wherein Jackson suggested that the woman engage in commercial sex acts in order to help fund his defense attorney and other jail related expenses.  Shortly thereafter, the woman began putting money on Jackson's books so that could make jail calls and purchase snacks from the canteen.

IV.     GENERAL KNOWLEDGE CONCERNING FACEBOOK/INSTAGRAM

26

121.    Facebook, Inc. owns and operates two free-access social networking websites that can be accessed at https://www.facebook.com or https://www.instagram.com.  Facebook, Inc. allows its users to establish accounts with Facebook or Instagram, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook or Instagram users, and sometimes with the general public.

122.    Facebook, Inc. asks users to provide basic contact and personal identifying information to Facebook, Inc., either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook, Inc. also assigns a user identification number to each account.

123.    A Facebook, Inc. user can connect directly with other individual Facebook or Instagram users by sending each user a "Friend Request" or "Follower Request".  If the recipient of a "Friend Request" or "Follower Request" accepts the request, then the two users will become "Friends" for purposes of Facebook or Instagram and can exchange communications or view information about each other.  Each Facebook, Inc. user's account includes a list of that user's "Friends" or "Followers".

124.    Facebook, Inc. users can select different levels of privacy for the communications and information associated with their Facebook or Instagram accounts.  By adjusting these privacy settings, a Facebook or Instagram user can make information available only to himself or herself, to particular Facebook or Instagram users, or to anyone with access to the Internet, including people who are not Facebook or Instagram users.  Facebook or Instagram accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook, Inc.

125.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their account posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

126.    Facebook, Inc. allows both Facebook and Instagram users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook, Inc. users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook, Inc.'s purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

127.    Facebook and Instagram users can exchange private messages on Facebook or Instagram with other users.  Those messages are stored by Facebook, Inc. unless deleted by the user.  Facebook or Instagram users can also post comments on profiles of other users or on their own profiles; such comments are typically associated with a specific photo, video, posting or item on the profile.  In addition, Facebook and Instagram has a chat feature that allows users to send

28

and receive instant messages. These chat communications are stored in the chat history for the account. Facebook and Instagram also have Video and Voice Calling features, and although Facebook, Inc. does not record the calls themselves, it does keep records of the date of each call.

128. Each Facebook and Instagram account has an activity log, which is a list of the user's posts and other activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" or "Following" a page or adding someone as a friend/follower. The activity log is visible to the user but cannot be viewed by people who visit the user's page.

129. Facebook has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

130. Facebook, Inc. also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook or Instagram, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

131. Social networking providers like Facebook, Inc. typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook or Instagram users may communicate directly with Facebook, Inc. about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook, Inc. typically retain records about such communications,

29

including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

132.    As explained herein, information stored in connection with a Facebook or Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook or Instagram user's IP log, stored electronic communications, and other data retained by Facebook, Inc. can indicate who has used or controlled the Facebook or Instagram account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook or Instagram account at a relevant time.  Further, Facebook or Instagram account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook, Inc. logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.  Additionally, Facebook, Inc. builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and "friends" or "followers" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook or Instagram account owner.  Last, Facebook or Instagram account activity may provide relevant

30

insight into the account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook or Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

133.    Therefore, the computers of Facebook, Inc. are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook and Instagram, such as account access information, transaction information, and other account information.

134.    I know based on my training and experience that traffickers and pimps commonly use Facebook or Instagram to indicate to others their status as a pimp and to show cash, vehicles, clothing, and other material goods they have obtained, as a result of the lifestyle. They also use Facebook and Instagram to communicate with and recruit victims of human trafficking.

## V.    INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

135.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

136.    This application seeks a warrant to search all responsive records and information under the control of Facebook, Inc., a provider subject to the jurisdiction of this Court, regardless of where Facebook, Inc. has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic

31

communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Facebook, Inc.'s possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[1]

## VI.    CONCLUSION

137.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

138.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

---

[1] In *Microsoft Corp. v. United States*, 829 F.3d 197 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. In the Eastern District of Wisconsin, however, in cases 17-MJ-1234 and 17-MJ-1235, 2017 U.D. Dist. LEXIS 24591 (Feb. 21, 2017), U.S. Magistrate Judge William E. Duffin rejected the Second Circuit's decision in *Microsoft* and issued warrants that required Google and Yahoo! to disclose "all data responsive to the warrant regardless of whether that data may be stored on servers in or outside the United States." I therefore respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Facebook, Inc. The government also seeks the disclosure of the physical location or locations where the information is stored.

32

**ATTACHMENT A**
**Premises to be Searched**

This warrant applies to information associated with the following Facebook and

Instagram user and stored at premises owned, maintained, controlled, or operated by Facebook,

Inc., a company headquartered in Menlo Park, California:

| NAME | FACEBOOK ACOUNT | SCREEN NAME |
|------|-----------------|-------------|
| Cornelius M. Jackson | https://www.facebook.com/Still.Shinnin.2018 | Corey Grills |
| Cornelius M. Jackson | https://www.facebook.com/corey.f.jackson | Corey Grills |
| Cornelius M. Jackson | https://www.instagram.com/stillshinnin | Still Shinnin |

**ATTACHMENT B**
**Items to be Seized**

I.    **Information to be disclosed by Facebook, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc., regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, Inc. or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook, Inc. is required to disclose the following information to the government for each user listed in Attachment A for the period of March 1, 2020 to the present:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' or followers' user identification numbers; groups and networks of which the user is a member, including the groups' identification numbers; future and past event postings; rejected "Friend" or "Follower" requests; comments; gifts;

pokes; tags; and information about the user's access and use of Facebook, Inc. applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" or "Follower" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all posts and all non-Facebook, Inc. webpages and content that the user has "liked;"

(j) All information about the pages that the account is or was a "fan" of;

(k) All past and present lists of friends or followers created by the account;

(l) All records of searches performed by the account;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual posts and activities, and all records showing which users have been blocked by the account;

(q)     All records pertaining to communications between Facebook, Inc. and any person regarding the user or the user's Facebook or Instagram account, including contacts with support services and records of actions taken.

Facebook, Inc. is hereby ordered to disclose the above information to the government within 14 DAYS of service of this warrant.

**II.     Information to be seized by the government**

All information described above in Section A that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Section 1591(a)(1) and (b)(1) (sex trafficking by force, fraud, or coercion); Title 18, United States Code, Section 1594(b) (conspiracy to commit sex trafficking); and Title 18, United States Code, Section 2421 (interstate transportation for the purpose of prostitution) involving Cornelius M. Jackson, including, information pertaining to the following matters:

(a)     Messages, photographs, videos, memes, status updates, comments, or other postings or communications related to:

1.     Interstate travel;

2.     "Pimping," "hoeing," or the exchange of sex for money;

3.     Recruitment of victims for commercial sex or sex trafficking;

4.     AV-1;

5.     AV-2; and

6.     AV-3;

(b)     Evidence of user attribution showing who used the accounts at the time the things described in this warrant were created, edited, or deleted;

(c)     Evidence indicating how and when the accounts were accessed or used, to

determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the account owner(s) or user(s);

(d)     Evidence indicating the account owner(s) or user(s)'s state of mind as it relates to the crime under investigation;

(e)     The identity of the person(s) who created or used the accounts, including records that help reveal the whereabouts of such person(s); and

(f)     The identities of the person(s) who communicated with the accounts about matters relating to the above-listed offenses, including records that help reveal their whereabouts.